not embrace an express company conducting its business under an arrangement with a railroad company, whereby the express company was granted the exclusive privilege of conducting the express business over the railway's lines. The court held that the affairs of the two companies were distinct and separate, and that an employee of the express company was not an employee of the railroad company under the terms of the act. The liability of the express company in the instant case must therefore be determined by the common law of Virginia; and under it, the plaintiff has no legal claim against the express company for the negligence of his fellow servants—even though they be servants of the express company itself.

It follows that if it should clearly appear from the record that the verdict of the jury was based on the negligence of the men who stored the car with mail, the finding would not support a judgment against the express company, but would be sound so far as the railway company is concerned. It is true that the pleadings make no mention of the federal act, but on the contrary state a case under the local law; for the declaration asserts that the plaintiff was the employee of the express company, and fails to say that he was also employed by the railway company. Moreover, the instructions requested and given by the court indicate that the rules of the common rather than of the federal law were to be applied. But neither of these circumstances prevents the application of the federal act, as the Supreme Court has repeatedly decided. Thus in Missouri, Kans. & Texas Ry. v. Wulf, 226 U. S. 570, 33 S. Ct. 135, 57 L. Ed. 355, Ann. Cas. 1914B, 134, it was contended that the complaint failed to state a cause of action under the federal act, but was grounded upon the state statute. But it was held that the trial court was presumed to be cognizant of the enactment of the Federal Employers' Liability Act (45 USCA §§ 51–59), and to know that it had the effect of superseding state laws upon the subject; and that therefore the pleader was not required to refer to the federal act and his reference to the state statute was immaterial. See also St. Louis, San Francisco Ry. v. Seale, 229 U. S. 156, 161, 33 S. Ct. 651, 57 L. Ed. 1129, Ann. Cas. 1914C, 156; Toledo, St. L. & West. R. R. Co. v. Slavin, 236 U. S. 454, 458, 35 S. Ct. 306, 59 L. Ed. 671; Grand Trunk Ry. Co. v. Lindsay, 233 U. S. 42, 48, 34 S. Ct. 581, 58 L. Ed. 838, Ann. Cas. 1914C, 168; Chicago, Rock Island & Pacific Ry. v.

Wright, 239 U. S. 548, 36 S. Ct. 185, 60 L. Ed. 431; Chicago, Rock Island & Pacific Ry. v. Ward, 252 U. S. 18, 23, 40 S. Ct. 275, 64 L. Ed. 430; Grand Trunk Ry. v. Thrift, 68 Ind. App. 198, 210, 115 N. E. 685, 116 N. E. 756.

The judgment of the District Court might be reversed as to the express company and affirmed as to the railway company, if it should appear that the instructions to the jury, although based on the rules of the common law, were not prejudicial to the latter defendant. But we are unable to reach this conclusion. The jury was wrongfully instructed, over the defendants' objections, that it might base a verdict for the plaintiff on the alleged dangerous character of the devices, or on the failure of the defendants to instruct the plaintiff; and it is impossible to determine whether the verdict rendered was based on one or both of these untenable grounds or on the finding, which would have some support in the evidence, that the stanchion fell because it was improperly placed in a receptacle. By reason of this uncertainty, the judgment must be reversed as to both defendants.

Reversed and remanded.

NORTHCOTT, Circuit Judge, dissents.

## CHEMICAL FOUNDATION, Inc., v. GENERAL ELECTRIC CO. et al.

### No. 276.

Circuit Court of Appeals, Second Circuit.
May 4, 1931.

The following is the statement and opinion of Thacher, J., in the District Court:

In Equity. Suit by the Chemical Foundation Inc., against General Electric Company and Victor X-ray Corporation for in-

fringement of Lilienfeld patent on a process and apparatus for producing Roentgen rays —No. 1,122,011, issued December 22, 1914. Defendants do not question plaintiff's title derived under the Alien Property Custodian.

The claims in suit are:

"7. A process for producing Roentgen rays having any desired degree of hardness in a tube having a vacuum sufficient to inhibit the passage of the high tension discharge which is intended to generate the Roentgen rays, consisting in creating in the tube independently to the means for generating Roentgen rays, a conductivity sufficient to permit the passage of said discharge while maintaining the said high vacuum.

"8. The process for producing Roentgen rays having any desired degree of hardness in a tube having a vacuum sufficient to inhibit the passage of the high tension discharge which is intended to generate the rays, consisting in creating in the tube the conductivity necessary for lowering the resistance in said tube independently to the means for generating the Roentgen rays while maintaining the said high vacuum."

The alleged infringing device is the well-known Coolidge X-ray tube, upon which patent No. 1,203,495 issued to Coolidge on October 31, 1916. The defenses alleged are invalidity and noninfringement.

### Opinion.

To produce an X-ray it is only necessary to bombard a metal target with electrons. The penetrability or hardness of the resulting rays depends upon the velocity with which the electrons strike the target. This was well known long before Lilienfeld. The method then employed was gas ionization. The difference of potential between two electrodes in a partially evacuated tube will ionize the atoms of gas and the electronic flow from cathode to anode will continue under the influence of the voltage applied to the terminals of the electrodes so long as ionization persists. Operation of such an X-ray tube depends upon the presence of gas in sufficient quantity to maintain ionization. As such tubes aged in use, they were found to require increasing voltages to pass the current from cathode to anode and it was known that this was due to gas exhaustion which progressively occurred in the operation of the tube. As the gas became exhausted and the voltage was increased, the rays became harder and harder, until a point was reached where no current passed and the tube became inoperative. These old tubes were not only

thus limited in the term of their usefulness, but inability to control, or at least to know, the character of the rays, placed serious limitation upon accurate and satisfactory use, and it was to these problems that the patent in suit was addressed.

In his specification Lilienfeld states the object of his invention as follows:

"The principal object of this invention is, therefore, to provide a process and apparatus wherein the hardness of radiation is not brought about by the alteration of the density of the gas within the tube, but on the contrary, by means of an auxiliary electrode actuated independently of the means for producing the Roentgen rays, this independent electrode being capable of starting a discharge in such a high vacuum that the ordinary anode and cathode would be prevented from operation. It is to be understood that this electrode works substantially independently of the degree of vacuum provided this vacuum is high, for example above the limiting value for the production of Roentgen rays in the ordinary manner.

"The invention has three distinct purposes to accomplish. The first of these is to provide a novel process and apparatus wherein a tube may be used which is primarily so highly evacuated that the resistance between the cathode and anticathode cannot be overcome by the ordinary tension, and consequently the production of Roentgen rays can not be accomplished.

"The second object is to provide an improved means for so reducing this resistance that the production of Roentgen rays may be accomplished with a high degree of evacuation of the tube.

"The third of these objects is the provision of means for and the process of using an alternating current for the production of Roentgen rays in a tube of this description.

"With the above and other objects in view, the invention consists in general of a certain novel means for producing these results and apparatus having details of construction and combination of parts hereinafter fully described, illustrated in the accompanying drawings, and specifically claimed."

He then describes the apparatus he has devised for carrying out the process of his invention: "In carrying out the process used herewith there is employed a Roentgen ray tube having an anode and cathode. Besides an anode and cathode there is also employed an electrode which can be raised to a high

degree of temperature, such as incandescency, by the passage of a current therethrough, said electrode acting as a cathode and there may be used a second anode also." He then says that the tube is to have a vacuum sufficiently high to inhibit the passage of the discharge between the electrodes, but that in operation "the resistance between the anode and cathode is reduced by breaking down said resistance by the activity of the incandescent cathode."

Operation of the Lilienfeld device is shown to be dependent upon ionization, and to be subject to definite limitations when subjected to very high voltages. Explanation is that in order to release electrons from the cold cathode the auxiliary hot cathode gives off electrons which ionize the atoms of the residual gas. These ions release the electrons from the cold cathode which are driven to the anode and thus generate the rays. When Lilienfeld's tube is operated under high potential between the main electrodes, there is a tendency to swamp out the current which heats to incandescence the auxiliary electron producing filament. ·

In his process claims, which are the only claims in suit, Lilienfeld did not limit his invention to any such means, but drew these claims broadly to cover the creation, by any means independent of the generating electrodes, of conductivity sufficient to permit the passage of the discharge in a vacuum sufficient to inhibit such passage without such means. Thus, he did not in terms limit his claim of invention to the process disclosed in his specification, which was dependent upon ionization, but extended it to any device by which the resistance of a high vacuum could be overcome without reducing the vacuum. It need not be decided whether such claims can be saved by reference to the specification, despite their apparent vice in attempting to preempt the solution of this problem by means other than those which constitute the invention disclosed. Assuming that they may be, and giving to them such liberality of construction as will include every means disclosed by Lilienfeld or known to others when his patent issued, it is not shown that these claims have been infringed.

Instead of employing an auxiliary hot cathode in aid of the electron discharge from a cold cathode, the Coolidge Tube eliminates ionization entirely and by the use of a hot Tungsten cathode succeeds in producing a deluge of electrons which, under the pressure of very high voltages and without any aid from any auxiliary device, are swept across from cathode to anode in a pure electron stream. In order to cover this device, the process claims, already stretched beyond any conception of means known to Lilienfeld, are stretched still further, and it is claimed that Coolidge has in his tube created conductivity "independently of the means for generating Roentgen rays." But Coolidge's hot cathode is clearly not within the meaning of this language. It is one of the generating means (i. e., the main cathode) to which the claims refer. Nor can it be said in the sense of the claims that Coolidge has created conductivity in the tube. In a process of ionization the term "conductivity" can refer only to the function which the gas, however rarefied it may be, performs as a conductor in aiding the passage of the discharge, and it must have been in this sense that the words were used. To give the term the meaning now claimed for it would be to reduce the process claims to the statement of an unsolved riddle —i. e., evacuate the tube until the resistance prevents operation, then overcome the resistance without impairing the vacuum. This is not the language a patent claim must speak, and unless the word "conductivity" is used in the sense of the specification, it can be given no meaning which could have been understood by the art when the patent issued.

On the ground that the Coolidge tube does not infringe the Lilienfeld invention, the complaint must be dismissed, with costs.

Thomas G. Haight, of Jersey City, N. J., Hugh M. Morris, of Wilmington, Del., John F. Neary, of New York City, and Louis W. McKernan, of Philadelphia, Pa., for appellant.

Charles Neave and Stephen H. Philbin, both of New York City, for appellees.

Before SWAN, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

PER CURIAM.

Decree affirmed on opinion of Thacher, District Judge.